1  VINCENT LEON GUERRERO
   P.O. BOX 12457
2  TAMUNING, GUAM 96931
   TELEPHONE: (671) 687-5947
3
4  WILLIAM T. DOWD (Pro Hac Vice)
   ALEX R. LUMAGHI (Pro Hac Vice)
5  LAURA G. LUMAGHI (Pro Hac Vice)
   RACHEL K. DOWD (Pro Hac Vice)
6  211 North Broadway, Suite 4050
7  St. Louis, Missouri 63102
   Tel: 314-621-2500
8  Fax: 314-621-2503

9  *Attorneys for Plaintiff Guam Waterworks Authority*

10

11              **IN THE DISTRICT COURT OF GUAM**

12  GUAM WATERWORKS            )    CIVIL CASE NO. CV20-00032
    AUTHORITY,                 )
13                             )
                Plaintiff,     )    **MEMORANDUM IN SUPPORT OF**
14                             )    **MOTION OF GUAM WATERWORKS**
         vs.                   )    **AUTHORITY TO EXCLUDE THE**
15                             )    **TESTIMONY AND OPINIONS OF J.**
                               )    **BRADLEY SARGENT**
16  BADGER METER, INC., et. al.)
                               )
17              Defendants.    )
                               )
18  _____)

19         COMES NOW Plaintiff Guam Waterworks Authority, by and through Counsel, and for its

20  Memorandum in Support of Motion to Exclude the Testimony and Opinions of J. Bradley Sargent

21  pursuant to Federal Rule of Evidence 702 and Federal Rule of Civil Procedure 26(a)(2), states as

22  follows:

23

24                        **TABLE OF CONTENTS**

25  I.     INTRODUCTION ........................................................................................ 1

26  II.    LEGAL STANDARD................................................................................... 1
27

28

                                  i

III.   MR. SARGENT SHOULD BE PROHIBITED FROM TESTIFYING AT
       TRIAL BECAUSE HE CONSIDERED CONFIDENTIAL SETTLEMENT
       MATERIALS AS A PART OF HIS ANALYSIS IN THIS CASE............................2

       A. BADGER'S DISCLOSURE OF MEDIATION DOCUMENTS
       VIOLATES GUAM LAW AND THE PARTIES' AGREEMENT TO
       MEDIATE................................................................................................4

       B. BADGER'S DISCLOSURE OF CONFIDENTIAL SETTLEMENT
       MATERIALS VIOLATES THE PUBLIC POLICY UNDERLYING THE
       SETTLEMENT NEGOTIATIONS PRIVILEGE........................................6

       C. THE PREJUDICE TO PLAINTIFF CANNOT BE PROPERLY
       REMEDIED OTHER THAN THROUGH EXCLUSION OF SARGENT'S
       TESTIMONY. ........................................................................................7

IV.    MR. SARGENT IS NOT QUALIFIED TO OPINE ON PLAINTIFF'S
       ECONOMIC DAMAGE MODEL DUE TO HIS LACK OF
       KNOWLEDGE OF THE WATER UTILITY INDUSTRY AND ITS
       PRACTICES.............................................................................................9

       A. SARGENT HAS NO EXPERIENCE IN THE WATER INDUSTRY
       OR ANY OTHER FIELD THAT WILL ASSIST JURORS IN
       UNDERSTANDING GWA'S DAMAGE MODEL OR ITS
       UNDERLYING DATA ...........................................................................10

       B. SARGENT MAKES REPEATED MISTAKES IN HIS REBUTTAL
       OF GWA'S DAMAGE MODEL BECAUSE OF HIS LACK OF
       EXPERIENCE AND KNOWLEDGE OF THE WATER UTILITY
       INDUSTRY ...........................................................................................11

            1. SARGENT DEMONSTRABLY DOES NOT UNDERSTAND THE
            DIFFERENT COMPONENTS OF REVENUE OF A WATER
            UTILITY..........................................................................................11

            2. SARGENT CLAIMED "ANOMALIES" IN THE DATA THAT
            ARE ORDINARY PRACTICES OF WATER UTILITY BILLING.................12

            3. SARGENT ERRONEOUSLY RELIES ON ANNUAL FINANCIAL
            STATEMENTS THAT DO NOT CONTAIN DATA RELEVANT TO A
            LOST REVENUE ANALYSIS FROM THE FAILING LP METERS..............13

V.     SHOULD MR. SARGENT NEVERTHELESS BE ALLOWED TO TESTIFY
       IN THIS CASE, THE COURT SHOULD STILL LIMIT HIS TESTIMONY
       AND EXCLUDE A NUMBER OF HIS IMPROPER OPINIONS .........................14

ii

A. MR. SARGENT SHOULD NOT BE ALLOWED TO TESTIFY OR COMMENT REGARDING MR. STANGER'S SUPPOSED "BIAS."....................14

B. SARGENT SHOULD NOT BE ALLOWED TO OPINE THAT GWA AS A NON-PROFIT ENTITY COULD STILL INCUR LOST "PROFITS" INSTEAD OF LOST "REVENUES."........................................................................15

C. SARGENT SHOULD BE PRECLUDED FROM PROVIDING ANY ALTERNATE DAMAGE CALCULATIONS OR SPECULATION REGARDING HOW HE WOULD HAVE APPROACHED MR. STANGER'S CALCULATION. ...............................................................16

iii

# TABLE OF AUTHORITIES

**Cases**

*Akamai Techs., Inc. v. Digital Island, Inc.*, No. C-00-3508 CW(JCS), 2002 WL 1285126 (N.D. Cal. May 30, 2002). ...................................................................................................... 5

*Albert D. Seeno Constr. Co. v. Aspen Ins. UK Ltd.*, No. 17-CV-03765-SI, 2020 WL 6118497 (N.D. Cal. Oct. 16, 2020). ......................................................................................... 5

*Banga v. Kanios*, 2020 WL 9037179 (N.D.Cal., 2020) .................................................... 14

*Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993). ........................................... 1

*Folb v. Motion Picture Indus. Pension & Health Plans*, 16 F. Supp. 2d 1164 (C.D. Cal. 1998)... 6

*Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.,* 332 F.3d 976 (6th Cir. 2003)........... 7

*Irwin Seating Co. v. Int'l Bus. Machines Corp.*, No. 1:04CV568, 2006 WL 3446584 (W.D. Mich. Nov. 29, 2006), aff'd, No. 1:04-CV-568, 2007 WL 518866 (W.D. Mich. Feb. 15, 2007). ..... 4, 7

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ................................................ 2, 9

*R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240 (9th Cir. 2012)............................... 16

*Reed v. Lieurance,* 863 F.3d 1196 (9th Cir. 2017). ..................................................... 14

*Ruiz v. Walmart Inc.,* 2021 WL 4796960 (C.D.Cal. 2021)........................................... 15

*Albert D. Seeno Constr. Co. v. Aspen Ins. UK Ltd.*, No. 17-CV-03765-SI, 2020 WL 6118497 (N.D. Cal. Oct. 16, 2020 ......................................................................................... 4

*United States v. Contra Costa County Water Dist.*, 678 F.2d 90 (9th Cir.1982 ............................ 7

*Webster ex rel. Webster v. National Heritage Realty, Inc.*, 2009 WL 485692 (S.D.Miss. 2009). . 9

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.* ("*Yeti*"), 259 F.3d 1101 (9th Cir. 2001).............. 16

**Statutes**

7 Guam Code § 43A103 ............................................................................................... 5

7 Guam Code § 43A201(b)........................................................................................ 4, 7

7 Guam Code § 43A201(c)(2022). ............................................................................... 4

7 Guam Code § 43A204 ............................................................................................... 4

iv

**Rules**

Federal Rule of Civil Procedure (c)(1); ................................................................... 16

Federal Rule of Evidence 702 ........................................................................................ 1

Federal Rule of Evidence  703 ....................................................................................... 8

Federal Rule of Evidence 501 ........................................................................................ 4

Federal Rule of Evidence 408 ........................................................................................ 8

Federal Rule of Civil Procedure 26(a)(2) ...................................................................... 1

v

## I.    INTRODUCTION.

Defendant has presented the opinions of its purported damage expert J. Bradley Sargent. Mr. Sargent has not performed his own damage calculation but has instead only criticized Plaintiff's lost revenue damage model. However, Mr. Sargent's opinions should be excluded by the Court. As set forth herein, Badger outrageously provided its damages expert not only with Plaintiff's confidential Mediation Brief, in violation of the agreement between the parties' and Guam law relating to mediation confidentiality, it provided Sargent with GWA's ***draft damage model*** created by Mr. Stanger. Doing so, in the face of counsel for GWA's express reservation in providing that information for purposes of mediation. Badger then failed to disclose this information prior to Mr. Sargent's deposition. The law is clear that Badger is not entitled to benefit from this betrayal of counsel's trust that the materials would only be used for purposes of mediation.

Furthermore, Mr. Sargent is not qualified to offer the opinions he has given under the specific facts of this case because, unlike Plaintiff's expert, he clearly has no knowledge of the water utility industry and its billing and other business practices.

Finally, if the Court does not exclude Mr. Sargent as an expert witness based on the foregoing, his testimony should be limited to those opinions that meet the requirements of Rule 702, and *Daubert*, and that were properly disclosed pursuant to Rule 26(a)(2). Specific opinions that failed to meet those requirements are discussed in Section V.

## II.    LEGAL STANDARD.

Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. *Daubert v. Merrell Dow Pharms. Inc*., 509 U.S. 579, 595 (1993). Fed. R. Evid. 702 states that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical,

1

or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Under Federal Rule of Evidence 702, trial courts must decide whether an expert "ha[s] sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case...,'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) (citation omitted).

### III. MR. SARGENT SHOULD BE PROHIBITED FROM TESTIFYING AT TRIAL BECAUSE HE CONSIDERED CONFIDENTIAL SETTLEMENT MATERIALS AS A PART OF HIS ANALYSIS IN THIS CASE.

Plaintiff's economic damages expert, Cody Stanger, spent months distilling and analyzing the usage and billing data of customer accounts with LP meters to determine the most sound and reliable economic damage model to measure GWA's lost revenue caused by the faulty LP meters. During mediation in November of 2021, 10 months before GWA disclosed the reports of its experts, Defendant Badger requested "some documentary support of the thorough analysis the consultants [were] doing on lost revenues." Dowd Decl. Ex. 1, Dowd Email November 8, 2021. In an email to Defense counsel, Plaintiff's counsel expressed GWA's significant concerns that the request to view the economic model for lost revenue was **an attempt to perform untimely discovery on the issues** and that the documents being requested were not otherwise discoverable. Id.[1] In hindsight, Plaintiff's concern was well founded. Nonetheless, settlement negotiations continued and on August 19, 2022, having previously cautioned Badger about use of damages-

---

[1] Counsel for Badger have asserted that the body of this email was not provided to Mr. Sargent, however it is still highly material in that it served to notify Badger that GWA was providing this damages information solely for purposes of settlement negotiations, and expressly did not want Badger to use such materials to perform improper discovery not permitted by the rules.

2

related materials for purposes of discovery or purposes other than mediation, Plaintiffs' counsel in an email with the subject "GWA Badger Meter – Confidential Settlement Correspondence" sent a summary economic damage model document along with the underlying consumption data, both marked for SETTLEMENT PURPOSES ONLY, to Badger's counsel. Dowd Decl. Ex. 2, Dowd Emails August 19, 2022. Counsel's email also expressly stated the materials were for settlement purposes only. See *Id*.

Plaintiff was provided with a short list of four "documents relied on" as Exhibit B to Sargent's report. Dowd Decl. Ex. 3, Sargent Report at 39. However, near the end of Sargent's deposition, Plaintiff's counsel was provided another list of 90 documents that the Defendant's accounting expert had considered but that had not been previously disclosed pursuant to the court's Scheduling Order with the Defendants Rule 26(a)(2) disclosures or as required by Rule 26(a)(2)(B)(ii). Dowd Decl. Ex. 4. It was not until his deposition that it was discovered that Mr. Sargent had been provided with Plaintiff's Confidential Mediation Statement with corresponding exhibits, as well as four documents from Mr. Stanger's draft damage models, all marked with "**For Settlement Purposes Only**" in both the filename and printed on the documents. See Dowd Decl. Ex. 4. Defense counsel also provided Mr. Sargent with the Defendant's Mediation Statement, marked "INADMISSIBLE UNDER FED. R. EVID. 408", demonstrating Badger's own knowledge that the material exchanged between the parties were solely for purposes of mediation.

Badger had no good faith basis for providing these materials to a proposed expert witness. And the bell cannot be unrung as Mr. Sargent was improperly provided highly sensitive information regarding Plaintiff's expert's protected work-product, including subsequent choices Mr. Stanger made in ultimately producing an improved damage model.[2] Badger has poisoned the

---

[2] After indicating during the deposition that Mr. Sargent would not be produced a second time, Badger later offered a deposition limited to the undisclosed materials, including the improperly-

well to such an extent that allowing Mr. Sargent to testify in this case ***at all*** after this violation

would be prejudicial to Plaintiff and in contravention of well-established law and public policy.

### A. BADGER'S DISCLOSURE OF MEDIATION DOCUMENTS VIOLATES GUAM LAW AND THE PARTIES' AGREEMENT TO MEDIATE.

Guam mediation law[3] provides the following regarding mediation privilege and

confidentiality:

> Evidence of anything said or of any admission made in the course of the mediation is not admissible in evidence and disclosure of any such document shall not be compelled in any arbitration or civil action in which, pursuant to law, testimony may be compelled to be given.
> 7 Guam Code § 43A201(c)(2022).

> Anything said, any admission made, or any writing that is inadmissible, protected from disclosure, and confidential under this Chapter 43A before a mediation ends, shall remain inadmissible, protected from disclosure, and confidential to the same extent after the mediation ends.
> 7 Guam Code § 43A204.

> In the event that any such evidence is offered in contravention of this Section, the arbitration tribunal or the court shall make any order which it considers to be appropriate to deal with the matter, including, without limitation, **orders restricting the introduction of evidence**, or dismissing the case without prejudice".
> 7 Guam Code § 43A201(b)

[Emph. suppl.]

In *Seeno Constr. Co.*, the district court excluded the plaintiff's expert who was provided

with and reviewed the defendant's mediation brief, despite the expert disclaiming any reliance on

---

provided mediation materials. However, as explained herein, a second deposition would only compound the problem, as GWA cannot question Mr. Sargent in detail regarding the effect of the draft damage model and other mediation materials without going into privileged and confidential information that Mr. Sargent should never have seen. See *Irwin Seating Co. v. Int'l Bus. Machines Corp.*, No. 1:04CV568, 2006 WL 3446584, at *3 (W.D. Mich. Nov. 29, 2006), aff'd, No. 1:04-CV-568, 2007 WL 518866 (W.D. Mich. Feb. 15, 2007).
[3] Under Federal Rule of Evidence 501, privileges provided by state law apply in civil actions in "which State law supplies the rule of decision." Fed. R. Evid. 501. Therefore, the Guam mediation privilege applies in diversity actions where state law is controlling. *See Albert D. Seeno Constr. Co. v. Aspen Ins. UK Ltd.*, No. 17-CV-03765-SI, 2020 WL 6118497, at *2 (N.D. Cal. Oct. 16, 2020).

4

the mediation brief in coming to his conclusions, based on the California mediation privilege statute. *Albert D. Seeno Constr. Co. v. Aspen Ins. UK Ltd*., No. 17-CV-03765-SI, 2020 WL 6118497, at *5 (N.D. Cal. Oct. 16, 2020). Here, like in *Seeno*, the text and intent of Guam's mediation law is clear: mediation communications are unequivocally and permanently inadmissible and privileged unless waived by the party making the disclosure or communication. A party may waive the privilege by providing their expert with their own mediation brief but *not* that of the other parties. *Id*. at *4.

The Guam mediation law further states that *"An agreement in a writing to settle a controversy by mediation shall be valid, irrevocable, and enforceable[.]"* 7 Guam Code § 43A103. Here, the Parties agreed prior to mediation "**that [] all statements, documents and disclosures made or revealed at the mediation will be treated as settlement discussions under the rules of evidence and will be inadmissible by any person unless offered by the person giving the statement, revealing the document or making the disclosure**." Dowd Decl. Ex 5, Mediation Agreement.

In *Akamai Technologies,* a Northern District of California court found, in the context of a Motion to Compel, that the attorneys' agreement that a "Damages Memorandum" marked "Confidential" would be revealed solely for the purpose of settlement negotiations was enforceable and therefore the work-product privilege over that document was not waived. *Akamai Techs., Inc. v. Digital Island, Inc*., No. C-00-3508 CW(JCS), 2002 WL 1285126, at *7 (N.D. Cal. May 30, 2002). In the present case, the parties had an explicit agreement that all statements, documents, and disclosures during mediation would be inadmissible, unless offered by the Party making the disclosure. In fact, courts routinely enforce discovery agreements between parties that a particular disclosure will not waive attorney-client and work product claims over related content. *Id*. In short,

5

mediation is a space where litigants may benefit by producing otherwise privileged information in the spirit of compromise and dispute resolution, without waiving that privilege.

The mediation statements, as well as the documents sent by the request of the mediator while settlement discussions continued after the Zoom mediation conference concluded on November 8, 2021, were to be protected from disclosure to Defendant's experts by the laws of Guam and the Mediation Contract entered into by both Parties. Furthermore, Defendant knew that those settlement disclosures were governed by Rule 408 and barred from being used as evidence at trial, as evidenced by the disclaimer on their own mediation brief. Dowd Decl. Ex. 6, Sargent Depo at 38:17-24.

### B. BADGER'S DISCLOSURE OF CONFIDENTIAL SETTLEMENT MATERIALS VIOLATES THE PUBLIC POLICY UNDERLYING THE SETTLEMENT NEGOTIATIONS PRIVILEGE.

Confidentiality encourages parties to attend mediation and communicate openly and honestly in order to facilitate successful alternative dispute resolution, but "without adequate legal protection, a party's candor in mediation might well be 'rewarded' by a discovery request or the revelation of mediation information at trial." *Folb v. Motion Picture Indus. Pension & Health Plans*, 16 F. Supp. 2d 1164, 1173 (C.D. Cal. 1998), *aff'd,* 216 F.3d 1082 (9th Cir. 2000) "A principal purpose of the mediation privilege is to provide mediation parties protection against these downside risks of a failed mediation." *Id*. The *Folb* Court expressed some doubt about the necessity of establishing mediation privilege because litigants *generally* abide by the confidentiality agreements and recognize "that courts, in appropriate instances, will accord mediation evidence Rule 408 and public policy-based protection."[4] *Id.*

_____

[4] In his regard, courts have also noted that public policy supports the confidentiality of mediation materials because the underlying motivations of the parties during settlement are fundamentally different than they are in other litigation contexts. "Settlement negotiations are typically

6

Here, Plaintiff is requesting the Court to enforce Guam mediation law, Rule 408 and the public policy reasons for confidential and inadmissible settlement communications and exclude Mr. Sargent from testifying pursuant to Guam mediation law, Section 43A201(b) (providing "In the event that any such evidence is offered in contravention of this Section, the arbitration tribunal or the court shall make any order which it considers to be appropriate to deal with the matter, including, without limitation, **orders restricting the introduction of evidence[.]**" [Emph. suppl.]

In this instance the proper remedy to protect Plaintiff from Badger's violation of the well-established public policy in keeping settlement negotiations and mediation confidential is to exclude Sargent from testifying in this case.

## C. THE PREJUDICE TO PLAINTIFF CANNOT BE PROPERLY REMEDIED OTHER THAN THROUGH EXCLUSION OF SARGENT'S TESTIMONY.

In *Irwin Seating Co.,* a district court in Michigan held that exclusion of the plaintiff's expert was the appropriate remedy where he'd been exposed to the mediation materials, clearly designated as confidential, in violation of the court's mediation order and the settlement privilege generally. *Irwin Seating Co. v. Int'l Bus. Machines Corp*., No. 1:04CV568, 2006 WL 3446584, at *3 (W.D. Mich. Nov. 29, 2006), aff'd No. 1:04-CV-568, 2007 WL 518866 (W.D. Mich. Feb. 15, 2007). The court held:

> **[T]here is no adequate way to assess the impact the mediation briefs had on the experts, and how the experts may have shaped their evaluations consciously or unconsciously in response to the claims made and positions taken by defendants in their mediation briefs**. Even in denying any recall of what defendants' positions were in their reports, both experts concede these briefs were among the first documents they read, 'in order to gain some sense of what the case was about.' The bell has been rung. There are simply some things that cannot be forgotten once they are learned. *Id.* [Emph. suppl.]

punctuated with numerous instances of puffing and posturing since they are 'motivated by a desire for peace rather than from a concession of the merits of the claim.'" *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.,* 332 F.3d 976, 981 (6th Cir. 2003) (citing *United States v. Contra Costa County Water Dist.,* 678 F.2d 90, 92 (9th Cir.1982)). The parties to mediation "may assume disputed facts to be true for the unique purpose of settlement negotiations. The discovery of these sort of 'facts' would be highly misleading if allowed to be used for purposes other than settlement." *Id.*

7

The court further found that bad-faith or not, it was the violating party who had to bear the brunt of the resolution. *Id.* The court held that "[T]he factual basis for the expert's opinion is subject to inquiry and cross-examination. Fed. R. Evid. 703. Because the information in issue is confidential, **Defendants will be unable to fully challenge the experts' assertions that their opinions were not influenced by confidential settlement knowledge**." *Id.* [Emph. suppl.] In this case, Plaintiff anticipates Badger will similarly and self-servingly claim that Sargent did not rely on these materials. GWA faces the same problem, in that it cannot "fully challenge" Badger's expert's reliance on the draft damage model without going into privileged and protected information that Badger should never have disclosed. Among other things, GWA cannot impeach or cross-examine Sargent with this information without opening the door to explaining Cody Stanger's draft model in detail, in violation of F.R.E. 408's protection of confidential settlement discussions as well as the expert work-product privilege.[5]

Defendant's conduct in providing these settlement materials to its expert was not only in derogation of Guam law, the Mediation Agreement, and Plaintiff's counsel's email warning of any ulterior motives by Defendant in seeking this information, but also the public policies and common understanding of the purpose for which mediation and settlement materials are to be used. As stated in *Irwin*, it is the violating party who must bear the brunt of the resolution given their violations of the rules and the agreement with Plaintiff.

---

[5] Nevertheless it is clear that Mr. Sargent's review of these materials profoundly impacted his opinions and criticisms of Plaintiff's damages expert. For example, Mr. Sargent opined in his deposition on two occasions that Mr. Stanger "abandoned" the data that was in Appendix B. Dowd Decl. Ex. 6, Sargent Depo. p. 60:21-22; 157: 2-8. Without getting into the privileged contents of Plaintiff's draft damage model, this statement still clearly leads to the inference that Mr. Sargent considered Mr. Stanger's prior damage model (and its differences from the ultimate model) in his opinions, as he would have no other way of knowing what Mr. Stanger "abandoned" in regard to the use of various data sources.

8

**IV.**   **MR. SARGENT IS NOT QUALIFIED TO OPINE ON PLAINTIFF'S ECONOMIC DAMAGE MODEL DUE TO HIS LACK OF KNOWLEDGE OF THE WATER UTILITY INDUSTRY AND ITS PRACTICES.**

Under Federal Rule of Evidence 702, trial courts must decide whether an expert "ha[s] sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case...,'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) (cit. omit). Courts have noted that evaluation of an expert's qualifications should be assessed "in light of the specific facts of the case." *Webster ex rel. Webster v. National Heritage Realty, Inc*., 2009 WL 485692, at *2 (S.D.Miss. 2009).

Here, Mr. Sargent lacks the requisite knowledge, skill, experience, training, and/or education to be qualified as an expert to rebut Mr. Stanger's economic damages model. Sargent is a Certified Public Accountant, with no specialized experience or knowledge in public utilities or their billing systems, who provides forensic accounting services to litigants. Dowd Decl. Ex. 6, Sargent Depo. at 17:1-9. Mr. Sargent is admittedly not an economist and did not provide any alternative economic model to the one presented by Mr. Stanger. Id.  at 39:20–23; 62: 6-13. And despite claiming to have worked on issues related to business valuation, economic loss, financial investigations and forensic accounting "across a wide array of industries,*"* Sargent has no utility-specific knowledge, nor did he even attempt to educate himself about utility-specific billing or accounting practices. Dowd Decl. Ex. 3, Sargent Report at 5. This has caused him to repeatedly call out "anomalies" in GWA's data, that are in fact commonplace in the water and wastewater industry, as explained more fully below.  Allowing him to testify will not only confuse the jury on an already complex issue of economic damages, but it will be an inefficient use of the jury's time due to Plaintiff's counsel and expert having to repeatedly respond to supposed "rebuttal" opinions

9

that are purely based on Mr. Sargent's lack of understanding of utilities and the water and wastewater industry.[6]

### A. SARGENT HAS NO EXPERIENCE IN THE WATER INDUSTRY OR ANY OTHER FIELD THAT WILL ASSIST JURORS IN UNDERSTANDING GWA'S DAMAGE MODEL OR ITS UNDERLYING DATA

While Sargent has many certifications in forensic accounting and the like, none of his certifications relate to the unique financial features of public utilities or municipalities. Dowd Decl. Ex. 3, Sargent Report at 5. He has never advised a utility on any issue. Dowd Decl. Ex. 6, Sargent Depo. at 119; 5-7. In over a decade of providing professional presentations, speeches and seminars related to forensic accounting, none have involved issues related to utilities. Dowd Decl. Ex. 6, Sargent Depo. at 128:7-15; Ex. 3, Report at 39. Likewise, he has never published on any issues related to utility revenues that he can recall. Dowd Decl. Ex. 6, Sargent Depo. at 127:19-22.

The lack of experience in this very specialized area of water utility revenues is perhaps best demonstrated by Mr. Sargent's attempt to create experience with water utility consumption and billing data. During his deposition he identified one case where he acted as a consultant, not testifying or preparing a written report, that "used" water consumption and billing data. Dowd Decl. Ex 6, Sargent Depo. at 54:11-13. However, based on his description of the dispute, wherein the City of Harvey was not paying their water bill to the City of Chicago but was charging other municipalities downstream for the water it got from Chicago, that case provides no relevant experience because it was a dispute between municipalities about water production and

---

[6] It appears that Badger hired an expert who is not qualified in the relevant area or industry but that their attorneys know to be a "hatchet man." Mr. Sargent estimated that he had worked with Foley & Lardner attorneys ten to twelve times on different cases and was co-presenting at a conference with a Foley attorney in the days following his deposition. Dowd Decl. Ex. 6 at 26: 7-12; 129:17 - 130:14.

10

distribution between entities, not related to consumption by individual water consumers based on the accuracy of water meters and meter by meter consumption data. Dowd Decl. Ex. 6, Sargent Depo. at 53:13-54:7. In fact the only specific consumption data he could recall looking at from that case was from a hospital that was not showing significant readings given its size. Id. at 54:19-55:6. Sargent did not recall whether that data set had negative monthly consumption readings. Id. at 84:14-21. Sargent also claims to have investigated one other case dealing with utility billing but could not recall the name of the utility and did not prepare a report or testify. Id. at 117:14 -118:8.

**B. SARGENT MAKES REPEATED MISTAKES IN HIS REBUTTAL OF GWA'S DAMAGE MODEL BECAUSE OF HIS LACK OF EXPERIENCE AND KNOWLEDGE OF THE WATER UTILITY INDUSTRY.**

**1. SARGENT DEMONSTRABLY DOES NOT UNDERSTAND THE DIFFERENT COMPONENTS OF REVENUE OF A WATER UTILITY.**

Mr. Sargent attempted to invalidate the Appendix B database by stratifying the consumption data for a single year single year, 2016, to come up with the revenue from LP meter accounts for that year and comparing that to the reported total water revenue in GWA's 2016 audited financial statement to try to "reconcile" the data with the Linear Degradation Model. Dowd Decl. Ex. 3, Sargent Report at 24. He then concluded that the "large variance" between his calculation and the revenue reported in the financial statement indicates "some anomaly in the Appendix B data." Id. What he failed to understand is that the *consumption measured from residential meters is just one of six different components* that make up GWA's total revenue as reflected in the audited financial statement. He was comparing apples to oranges. See Dowd Decl. Ex. 7, Stanger Rebuttal Report at 5-6. Further demonstrating his inexperience, Mr. Sargent testified that he has no opinion on whether water revenue components consist of a monthly base charge and likewise no opinion on whether the components of water revenue listed in Table 2 of Mr. Stanger's rebuttal report were correct. Dowd Decl. Ex. 6, Sargent Depo. at 74:22-76:24. Mr. Sargent erred

11

in his analysis of the data and the model due to his lack of understanding of water industry revenue structure and now admits he cannot provide any opinion on those revenue components.

### 2. SARGENT CLAIMED "ANOMALIES" IN THE DATA THAT ARE ORDINARY PRACTICES OF WATER UTILITY BILLING.

Sargent's lack of familiarity with the context of the current lawsuit causes him to repeatedly make elementary errors in his criticisms of Plaintiff's damage expert. Namely, Sargent repeatedly blunders in his report by calling out supposed data "anomalies" that are not anomalies at all but commonplace in utility billing practices. For example:

1. Mr. Sargent's *only* criticism of the LP meter test data, Appendix C to the Stanger report, is that it showed meters that tested above 100% accuracy. Dowd Decl. Ex. 3, Sargent Report, p. 15. Sargent further criticized Mr. Stanger for not providing an "explanation" for a meter having test results above 100%. Id. at 11. He then admitted in deposition after being confronted with the AWWA testing standards that the water meter industry itself recognizes that meters test above 100% and that he was not aware of that fact until his deposition. Dowd Decl. Ex. 6, Sargent Depo. at 95:10- 96:6.

2. Sargent points to negative consumption numbers in the billing data as evidence of problems with the database as a whole, when in reality the negative consumption readings represent just 0.04% of the non-zero readings in the database and are explained by corrections to overbilling that can occur in prior billing periods, and is commonplace in the industry. Dowd Decl. Ex. 7, Cody Stanger Rebuttal Report at 2.

3. Sargent points to 7 meters, or 0.02% of the dataset of almost 32,000 meters, that had an "anomalous" reading of 20 times the average consumption over those meters' installations, and completely ignores the possibility that a water consumer may have periods of abnormally high-water consumption due to things like filling a pool, or having a significant leak due to a pipe burst on the customer side of the meter. The combination of the small portion of the data he is calling into question together with his ignorance of industry explanations shows that he is grasping at straws as an advocate trying to undermine the model. Id. at 2.

4. Sargent also criticizes the data because of meters showing consecutive months of zero readings and overlooks the most obvious explanation that is the basis for this lawsuit, that LP meters failed catastrophically and were not measuring water consumption. He also chooses to ignore other explanations explained by Mr. Stanger such as seasonal occupancy or meters being removed for testing that an industry expert would understand. Id. at 2-3.

12

### 3. SARGENT ERRONEOUSLY RELIES ON ANNUAL FINANCIAL STATEMENTS THAT DO NOT CONTAIN DATA RELEVANT TO A LOST REVENUE ANALYSIS FROM THE FAILING LP METERS.

In his rebuttal report Sargent repeatedly refers to, and heavily relies on, GWA's audited annual financial statements, which to an accountant may seem like they should contain relevant data to GWA's financial losses. See, e.g., Dowd Decl. Ex. 3, Sargent Report at 3, Opinion No. 3 and at 20. Nonetheless, Sargent admitted in deposition that the annual financial statements do *not* contain any data that would allow GWA to understand the revenues lost due to the failure of the LP meters to accurately record customers' water consumption. Dowd Decl. Ex. 6, Sargent Depo. at 65:2 – 66:8. The financial statements, in fact, do not contain any individual consumption or billing data at all, let alone the data relating to LP metered accounts. Id. Perhaps Mr. Sargent's confusion on the relevance of the financial statement should not be surprising given that Sargent, as a CPA, has never prepared an audited financial statement for a utility, or done any form of accounting work for a utility. Id. at 16:12-25. Sargent also recognizes that the revenue components as described in Section IV.B.1, that he failed to address in his attempts to "reconcile" the data with the Linear Degradation Model, are *not* contained in the annual financial statements. Id. at 76:8-13.

It is clear from his report and deposition that Mr. Sargent does not understand basic concepts related to water meter consumption or utility billing practices, that he has no experience with lost revenues damages of a utility, that he has never calculated economic damages from consumption/billing data, and that he fundamentally does not understand the concept of an economic model such as the Linear Degradation Model as applied in this case. Mr. Sargent did not employ any specialized knowledge, technique or method in analyzing Stanger's model and his opinions amount to an attempt to bolster any cross examination of Cody Stanger, as his lack of

13

expertise in the water utility industry demonstrates that he can in no away assist the jury in evaluating GWA's damage model.

**V.     SHOULD MR. SARGENT NEVERTHELESS BE ALLOWED TO TESTIFY IN THIS CASE, THE COURT SHOULD STILL LIMIT HIS TESTIMONY AND EXCLUDE A NUMBER OF HIS IMPROPER OPINIONS.**

**A.  MR. SARGENT SHOULD NOT BE ALLOWED TO TESTIFY OR COMMENT REGARDING MR. STANGER'S SUPPOSED "BIAS."**

Mr. Sargent attended the deposition of Mr. Stanger which occurred the day before his deposition. Mr. Sargent testified that he developed an opinion during Mr. Stanger's deposition that there could be an "**issue of bias**." Dowd Decl. Ex. 6, Sargent Depo. at 45:17 – 46:2. He claimed that Mr. Stanger made an unsubstantiated statement of fact in his report that indicated bias. The example he gave was from an introductory paragraph to Mr. Stanger's report where he stated that GWA customers were complaining about their water bills. Sargent Depo p. 46:21 – 47:7. Notably this issue has no relevance to the economic damage model and was solely background information included in his report. Sargent also stated that Mr. Stanger's prior relationship with GWA working on a case with the Public Utilities Commission to increase rates "could be" indicative of bias. Dowd Decl. Ex. 6, Sargent Depo. at 45:23–50:12.

First, it is plainly improper for Sargent to comment on Mr. Stanger's credibility as experts are not permitted to do so and that is the sole province of the jurors. *See Banga v. Kanios*, 2020 WL 9037179, at *3 (N.D.Cal., 2020), (holding that "an expert witness is not permitted to testify specifically to a witness' credibility" and that expert was barred from commenting on witness' testimony based on alleged "inaccuracies, omissions, and misrepresentations,") citing *Reed v. Lieurance,* 863 F.3d 1196, 1209 (9th Cir. 2017). Any such opinion is improper as a matter of law, and would also unfairly bolster any cross-examination or closing argument of the Defendant. Furthermore, Sargent has no qualifications, experience or special knowledge related to evaluating

14

an expert witness's "bias." Lastly, this opinion lacks a reliable foundation, given that the only example he provided was based on Mr. Stanger testifying that he believed he learned about customers complaining about their water bill during a conference call with GWA. Dowd Decl. Ex. 6, Sargent Depo. at 46: 21 – 47: 7.

### B. SARGENT SHOULD NOT BE ALLOWED TO OPINE THAT GWA AS A NON-PROFIT ENTITY COULD STILL INCUR LOST "PROFITS" INSTEAD OF LOST "REVENUES."

During his deposition, Mr. Sargent took issue with the section of Stanger's report and deposition testimony describing why GWA's economic losses due to the faulty LP meters constituted revenue loss, contending that GWA as an entity could still suffer lost profits. Dowd Decl. Ex. 6, Sargent Depo. at 122:8-126:4. It was not until his deposition that Sargent opined for the first time that GWA could suffer lost profits under "basic fund accounting" principles despite being aware of Mr. Stanger's position on lost revenues that was clearly included in his original report.  Sargent was aware, based on Mr. Stanger's report, that Mr. Stanger was of the opinion that this was a lost revenue case, not lost profits, and yet Mr. Sargent did not rebut this opinion in his report, even though he admittedly could have done so. Id. at 165:8-14; 166:25 -167:2.

An expert report is required to include "a complete statement of all opinions the witness will express and the basis and reasons for them." *See Ruiz v. Walmart Inc.,* 2021 WL 4796960, at *2 (C.D.Cal. 2021). Mr. Sargent's "lost profits" opinion was not disclosed in his original report, and Badger has failed to supplement that report in a timely or reasonable manner with this new opinion, the bas and reasons therefore and the materials considered in relation to it, all as required by the expert report provisions of Rule 26(a). Plaintiff's counsel did not have notice of this

15

significant new opinion prior to his deposition, for which Mr. Sargent had no excuse or justification in failing to disclose in a timely manner.[7]

Plaintiff's counsel was thereby deprived of the ability to fully and properly prepare for examination on this opinion during his deposition, and Mr. Stanger was deprived of the ability to address this issue in his rebuttal report, which had already been provided to Badger. Furthermore, and as presented in detail above, Mr. Sargent simply does not have the qualifications to opine on the financial structure of water utilities. For all of these reasons this opinion should be excluded.

### C. SARGENT SHOULD BE PRECLUDED FROM PROVIDING ANY ALTERNATE DAMAGE CALCULATIONS OR SPECULATION REGARDING HOW HE WOULD HAVE APPROACHED MR. STANGER'S CALCULATION.

As stated above, Mr. Sargent explicitly disclaimed *any* opinion on a more accurate or alternate calculation of GWA's economic damages, nor did he include any alternative calculations in his Report. See Dowd Decl. Ex. 3. In fact, in his only testimony regarding what his approach would have been to calculate lost revenues, he stated he would have ignored the consumption and billing data, even if it was consistent with industry expectations, and instead use the audited financial statements to form such an expert opinion. Dowd Decl. Ex. 6, Sargent Depo. at 87:1-21. Yet in the same deposition he admitted the financial statements do not discuss LP meter

---

[7] The Ninth Circuit gives "particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)," which "gives teeth to the Rule 26(a) disclosure requirements." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.* ("*Yeti*"), 259 F.3d 1101, 1106 (9th Cir. 2001). Rule 37(c)(1) is a "recognized broadening of the sanctioning power," id., which the Federal Rules Advisory Committee described as a "self-executing," "automatic" sanction to "provide[ ] a strong inducement for disclosure of material...," Adv. Comm. Notes to 1993 Amendments. As stated above, the rule provides two exceptions to the otherwise "automatic" sanction of witness preclusion: where the failure to disclose the required information is (1) "substantially justified," or (2) "harmless." Fed. R. Civ. P. 37(c)(1); see *Yeti*, 259 F.3d at 1106. "The party facing sanctions bears the burden of proving that its failure to disclose the required information was substantially justified or is harmless." *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1246 (9th Cir. 2012).

16

consumption or billings related to LP customers. Id. at 65:15-23. And he further admitted that the audited financial statements do not make any attempt to specifically identify lost revenue from LP meters. Id. at 66:25 – 66:8. Under all of these circumstances, Sargent should be prohibited from testifying as to what "he would have done" in an economic damage calculation in this case.

**WHEREFORE**, Plaintiff Guam Waterworks Authority respectfully prays that this Honorable Court make and enter its Order prohibiting J. Bradly Sargent from testifying in the trial of this cause, or in the alternative (1) exclude any testimony regarding Mr. Stanger's purported "bias" or otherwise improperly commenting on the credibility of any witness; (2) exclude any testimony that GWA could incur "lost profits" under accounting principles or otherwise; (3) exclude any testimony regarding an alternate calculation or alternate methods of calculating GWA's damages; (4) exclude any other opinions or expert testimony not properly disclosed in Mr. Sargent's report and deposition; and (5) for any other relief the Court deems just and proper, the premises considered.

**DATED** this 1st day of March, 2023.

Respectfully submitted.

DOWD & DOWD, P.C.

By:/s/ *William T. Dowd*
WILLIAM T. DOWD (Pro Hac Vice)
ALEX R. LUMAGHI (Pro Hac Vice)
LAURA G. LUMAGHI (Pro Hac Vice)
RACHEL K. DOWD (Pro Hac Vice)
211 North Broadway, Suite 4050
St. Louis, Missouri 63102
Tel: 314-621-2500
Fax: 314-621-2503
*bill@dowdlaw.net*
*alex@dowdlaw.net*
*laura@dowdlaw.net*
*racheldowd@dowdlaw.net*

VINCENT LEON GUERRERO
P.O. Box 12457

17

Tamuning, Guam 96931
Telephone: (671) 687-5947
*vlgguamlaw@gmail.com*

*Attorneys for Plaintiff Guam Waterworks Authority*

**CERTIFICATE OF SERVICE**

The undersigned counsel certifies that a copy of the above Memorandum in Support of Motion to Exclude the Testimony and Opinions of J. Bradley Sargent was served by operation of the Court's electronic filing system on all counsel of record this 1st day of March, 2023.

| | |
|---|---|
| Thomas L. Shriner, Jr.<br>Philip C. Babler<br>Anne-Louise T. Mittal<br>Foley & Lardner LLP<br>777 E. Wisconsin Ave.<br>Milwaukee, WI 53202<br>414-319-7215<br>Email:  tshriner@foley.com<br>        pcbabler@foley.com,<br>        amittal@foley.com | Thomas C. Sterling<br>Richard L. Johnson<br>Blair Sterling Johnson and Martinez<br>238 Archbishop Flores Street<br>Suite 1008, DNA Building<br>Hagatna, GU 96910-5205<br>671-477-7857<br>Fax: 671-472-4290<br>Email: tcsterling@bsjmlaw.com<br>        rjohnson@bsjmlaw.com |
| Venessa Miller<br>Foley & Lardner LLP<br>500 Woodward Ave., Suite 2700<br>Detroit, MI 48226<br>Email: vmiller@foley.com | |

By:    */s/ William T. Dowd*

18